ELDER et al. v. UNITED STATES.*

(Circuit Court of Appeals, Ninth Circuit. June 16, 1917)

No. 2816.

1. CRIMINAL LAW ⬤⟶1160—REVIEW—QUESTIONS OF FACT—APPROVAL OF VERDICT BY TRIAL COURT.

Where, on a trial for conspiracy to use the mails in furtherance of a scheme to defraud, there was a great deal of substantial evidence to sustain the allegations of the indictment, and the trial court declined to grant a new trial for insufficiency of the evidence to sustain a verdict, the Circuit Court of Appeals could not disturb the conclusion of the jury as to the existence of the facts or the inferences to be drawn therefrom.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 3084.]

2. INDICTMENT AND INFORMATION ⬤⟶137(3)—GROUNDS FOR QUASHING—MISCONDUCT OF GRAND JUROR.

It was no ground for quashing an indictment for using the mails in furtherance of a scheme to defraud, in connection with the sale of stocks and bonds of an investment company, that the matter was brought to the attention of the grand jury by one of its members, who, as a practicing attorney, had represented a client holding some of the obligations of the investment company, where, after calling the matter to the attention of the grand jury, he withdrew and did not attend the sessions of such grand jury while the investigation of the matter was in progress, and did not hear any of the evidence, and took no part in the consideration or discussion of the matter.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 482, 484.]

3. CRIMINAL LAW ⬤⟶927(1)—NEW TRIAL—MISCONDUCT OF JUROR.

It was not error to deny a new trial on the ground that one of the jurors, notwithstanding an order that the jury should not be allowed to separate, left the other jurors, and went to his office over the protest of the bailiff in charge, and was absent about 20 minutes, where no circumstance was shown to justify an inference of possible injury to defendant's rights.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2257, 2258.]

In Error to the District Court of the United States for the Southern Division of the Southern District of California; Benjamin F. Bledsoe, Judge.

Chas. A. Elder and others were convicted of an offense, and they bring error. Affirmed.

[26] Ritzema v. Brick Co., 152 Mich. 75, 115 N. W. 705; Hodgson v. Railroad Co., 146 Mich. 627, 109 N. W. 1125.

* Rehearing denied October 8, 1917.

F. McD. Spencer and S. M. Johnstone, both of Los Angeles, Cal., for plaintiffs in error.

Albert Schoonover, U. S. Atty., of Los Angeles, Cal., for the United States.

Before GILBERT, MORROW, and HUNT, Circuit Judges.

HUNT, Circuit Judge. The defendants Chas. A. Elder, W D. Deeble, and George M. Derby (plaintiffs in error), together with eight others, were indicted under section 37 of the Criminal Code (Act March 4, 1909, c. 321, 35 Stat. 1096 [Comp. St. 1916, § 10201]) for conspiracy to violate section 215 (Comp. St. 1916, § 10385), in using the mails in furtherance of a scheme to defraud. The plaintiffs in error were convicted, and the other defendants were acquitted.

The indictment charged, in substance, that in January, 1911, Elder, Deeble, Derby, and others were in exclusive control of the affairs of the Los Angeles Investment Company, a California corporation at Los Angeles; that defendants conspired to defraud divers persons, inducing them by false and fraudulent representations to purchase of shares and bonds in the corporation at prices greatly in excess of their value, and for the purpose of executing the scheme would place, and cause to be placed, letters, ·circulars, etc., in the mail of the United States, in which mail matter they would pretend that the earnings of the company were grossly in excess of what they actually were, and that the cash balances on hand were grossly in excess of the actual balances; that the stock was increasing in actual value at the rate of 5 per cent. of its par value per month; that a so-called "Guarantee Fund" was maintained under the control of the Globe Savings Bank of Los Angeles for the protection of the stock purchasers, and that there were and would be in this fund amounts grossly in excess of what it actually contained, and that no one ever had or could buy a single share of stock in the company except upon payment of the full purchase price in cash or by a one-third cash payment with the remainder in notes; that the payment of certain so-called "Gold Notes" was secured by a first lien on the treasury and real estate of the corporation, and that the entire stock premiums were held for the future benefit of stockholders, and that the dividends declared upon the stock were paid out and would be paid out of the earnings and profits of the corporation, and if a balance was due the corporation from stockholders, including defendants, all dividends payable to such stockholders would be applied on the amount owing by them; that the defendants, as a part of the conspiracy, would issue to themselves about 1,000,000 shares of the stock of the corporation without consideration therefor, and would pay to themselves dividends upon it, and would divert money of the corporation to the "Guarantee Fund," and would divert money to "Home Makers," a corporation controlled and managed by defendants.

The overt acts charged consisted of mailing of letters and copies of "Homes of Los Angeles," a paper published each month by defendants in the name of the Los Angeles Investment Company. These alleged published representations related to "Gold Notes" as safe and

sure investments secured by first lien on the treasury and real estate of the corporation. One of the advertisements pertained to dividends and expenses as being paid out of actual profits, not for premiums on sales of stock, and the surplus was published as over $7,800,000 in November, 1912. Another copy of the paper, in April, 1913, published that the guarantee fund of the company, held as a separate fund and managed by officers of the Globe Savings Bank, amounted to $252,-242.51, a gain of 128 per cent. during the year next preceding publication. In October, 1913, the paper published that the balances due, mortgages, loans, etc., amounted to over $10,000,000, and that these loans were made on security much in excess of the amount of the loan. Another overt act charged was mailing a letter to Mrs. Carns in Los Angeles, telling her that, if she bought stock and left it for reinvestment, at each time dividends would be sufficient to buy five shares or more the reinvestment would be made, and she would be sent a notice together with an order for the stock certificate, and when this was signed and returned the certificate would be mailed to her; that, if the dividend did not amount to enough to purchase five shares, she would be sent a credit memorandum each quarter, and that she would not lose by her investment, as the "Guarantee Fund" of $100,000 was an assurance of her protection. This letter contained other alluring statements concerning the proposed investment. . Other letters are set forth in the overt acts alleged, but it is enough to say that they represented that the notes and obligations of the company were amply secured, and that the stock would be advanced in price after December 31, 1912. In one letter mailed under date of October 13, 1913, addressed to the stockholders, they were told that the company had sufficient profits to warrant a dividend. The stockholders were asked as to their advice in the premises, and told that the stock was worth more if a dividend was not declared.

The testimony is voluminous, but the gist of much of it is as follows: Elder, Deeble, and Derby were the president, secretary, and treasurer, respectively, of the Los Angeles Investment Company, and all three were directors and in control. Elder was also director and president of "Home Makers," a corporation owned by the defendant, and was trustee of the "Guarantee Fund," and also director and president of the Globe Savings Bank. Deeble and Derby were also directors and officials in the "Home Makers" and in the Globe Savings Bank. They sold 5,000,000 shares of the capital stock of the Los Angeles Investment Company, of the par value of $1 each, for over $16,-000,000. They also sold the obligations of the "Gold Notes," of more than $2,000,000, and certificates of over $500,000. 670,588 shares of the capital stock of the Investment Company were issued to the 11 persons who had been included in this indictment, at an aggregate price of $1,306,305.75, charged against the 11, leaving $18,246,622.81, for which the stock and obligations of the company were sold to the public. Counsel for the United States accepts the statement of counsel for defendants, that the "company had throughout its history paid a quarterly cash dividend amounting to 7 per cent. per annum, upon the market value of the stock at the time of the dividend. The company had also advanced in each of the eight nondividend months every year

the selling price of its stock five cents per share." The evidence showed that a vigorous campaign of advertising was carried on through the paper "Homes," the paper having large circulation by mail and personal delivery. Pamphlets, entitled "Seventeen Miles of Dividends," were also mailed to prospective investors. In the publications the company stated that stock could be bought at the price quoted until after the first day of the ensuing month, when the price would be advanced five cents a share, and it was published that 7 per cent. interest on the market value of the stock at the time the dividend was declared was justified as payable out of the actual earnings and profits of the company, emphasis being laid on the statement that the company was not paying any portion of its dividends from the profits on the sales of the stock, all such profits being carried to the surplus account, in which, for instance, in July, 1912, there were over $6,000,000. The method of making such announcements was by publishing in "Homes" a "Question Box." For example, in the issue of January, 1911, in the "Question Box," we find:

"Question: From what source can you pay 28 per cent. a year in cash dividends?"

"Answer: All dividends are paid from profits on real estate, interest on loans, building profits, architectural, rental, and insurance departments, etc. The last annual statement showed profits for the preceding year to be, for real estate, $261,319.69; for interest, $180,000.00; and for building construction, $10,191.89."

At a directors' meeting held on May 7, 1901, the directors present, Elder, Deeble, Derby, and Fay, declared a dividend of 200 per cent. on the paid-up capital stock of the corporation "out of the surplus earnings of the corporation already accrued and hereafter to accrue," payable to the stockholders in proportion to their several holdings. A resolution passed the same day also provided that the stockholders might purchase with the dividends treasury stock to the entire amount of the dividends, at $1 per share if purchased on or before May 31, 1901, and the president and secretary were authorized to sell treasury stock to the amount of $1,000 to pay the debts of the company. There was evidence to the effect that when this 200 per cent. dividend was declared the outstanding capital stock was 2,000 shares, which made the dividend $4,000; but it appears that at that time there was a deficit on the books of the company amounting to $696.57. In August, 1901, this deficit was covered by "surplus earnings of the corporation hereafter to accrue," in this way: 2,081 shares of stock in a corporation called the Automatic Tool Company was placed on the books as worth 40 cents a share, a total of $771.44, which covered the deficit and left a small excess. But the evidence showed that 46 shares of stock in the tool company cost the Los Angeles Investment Company 10 cents a share, that 522 shares cost 5 cents a share, and 1,513 shares cost 2 cents a share; that the 1,513 shares were acquired on July 31, 1901, one day before the deficit created by the dividend was covered by putting the tool company stock at 40 cents a share. Subsequently the stock of the Automatic Tool Company was charged off to profit and loss in installments. Notwithstanding such conditions, the company continued to advertise that cash dividends had been declared, and that

the company had paid 677 per cent. in quarterly cash dividends, and in May, 1913, in "Homes," tables were published showing enormous profits to investors. Advertisements at different times also elaborated upon the security of the "Guarantee Fund" as giving a positive guarantee to the small stockholder that he could not lose his money. It was represented that the "Guarantee Fund" was made up of the contributions of the officers of the company and maintained independently of possible control by such officers, thereby perpetually assuring to the investor that the company was a practically perfectly safe concern. In one issue of "Homes," March, 1913, it was said, in speaking of the guarantee fund, "It is a trust fund * * * for one purpose, to protect the small stockholder against loss. This fund is a perpetual trust," etc. Letters purporting to come from stockholders expressing satisfaction with the "Guarantee Fund" were published in "Homes," and it was stated that the "Guarantee Fund" in December, 1911, contained over $100,000 in money ready to buy back stock from those who wished to sell, whereas the evidence goes to show that in 1911 there was in the "Guarantee Fund" only $20,156 cash, together with debts due to it by the directors amounting to over $54,800, and stock in the Los Angeles Investment Company carried at over $25,700. In January, 1913, the representation in "Homes" was that the "Guarantee Fund" amounted to over $219,000, but the evidence is that there was then only $4,268 in cash in the fund, that the indebtedness of the directors was $144,115, and that the Los Angeles Investment Company stock was carried at $317,658. Elder, one of the directors, then owed the "Guarantee Fund" $58,904.08, Deeble owed it $32,868.05, and Derby owed $40,226.34.

When the adoption of the proposed "Blue Sky Law" was being advocated in California, "Homes" in February, 1913, and in subsequent issues, opposed such proposed legislation; but stated that, before the law could be effective, the Los Angeles Investment Company would be a closed corporation, with no stock for sale, and therefore would not be brought within the provisions of the proposed law. The contemplated disposition of the stock of the company was advertised in an interview had with Elder, wherein Elder spoke of expected sale of the property of the company, 6,000 acres, to certain capitalists at $3,000 per acre. Another effort to sell stock seems to have been made, by advertising to the effect that a bankers' syndicate was being formed to buy all the shares of the Investment Company remaining unsold on the last day of May, 1913. Stockholders were advised that the syndicate was open for them to come into, and that the syndicate intended to buy at $4.35 a share. But on June 1st over 200,000 shares of the capital stock of the company were still unsold. The officers of the Investment Company then as of date of May 31, 1913, transferred these 200,000 and more shares from the Investment Company to the "Guarantee Fund," at $4.30 per share, in acceptance of an offer of the "Guarantee Fund" to the company, spread upon the minutes of the director's meeting of the Investment Company of May 7, 1913. The consideration named for this transfer was $860,176.30, upon terms, one-third cash, and the balance by note executed by Elder and Derby as trustees of the "Guarantee Fund," dated May 31, 1913, due three

years after date. There is evidence that on May 31, 1913, the "Guarantee Fund" had a cash balance of $14,998.42. On June 4, 1913, the Investment Company advanced to the fund $255,000, and on June 5, 1913, the fund gave its check to the Investment Company for a cash payment of $286,725.45. In the issue of "Homes" published in June, 1913, it was stated that the bankers' syndicate had vanished into "thin air," as the stock of the company was completely sold on the last day of May, "making an immense addition to the paid-up capital and surplus of the company, an addition of $1,172,695.16, bringing the total up to the stupendous sum of $16,884,964.53." It appears, however, that in 1913, when the "Guarantee Fund" purchased the shares of the Investment Company's stock, there was a decline in the shares of the Investment Company, and certain stockholders became suspicious. Between January 1, 1913, and May 31, 1913, the company sold 860,363 shares of its stock, but the price dropped from $4.12½ to $1.15½. For the stock charged to Elder, Deeble, and Derby, the par value of which represented $947,000, they did not pay even a third in cash, nor did Deeble, Derby, and Elder apply dividends received by them upon their debts to the company, and the evidence tends to show that the defendants diverted over $2,000,000 of the money of the Investment Company to the "Guarantee Fund," and over $230,000 to the "Home Makers."

[1] The issues tried called for a verdict predicated upon the question whether or not the prosecution proved that defendants devised and entered upon the scheme charged with intent to defraud stockholders and made use of the mails in the execution of the scheme. The defendants contend that the evidence was insufficient to warrant conclusion of guilt. But where there is as much substantial evidence as the foregoing statement shows there was, to sustain the allegations of fact in the indictment, and the trial court has declined to grant a new trial based upon the ground of insufficiency of evidence to sustain the verdict, it is not for the appellate court to disturb the conclusion of the jury, either as to the existence of the facts or as to the inferences drawn from the facts. Humes v. U. S., 170 U. S. 210, 18 Sup. Ct. 602, 42 L. Ed. 1011.

[2] It is argued that the court erred in not quashing the indictment because of misconduct on the part of a grand juror. One of the grand jurors, Mr. A. S. Gear, had been a practicing attorney at law, and was interested in some of the "Gold Notes" issued by the Los Angeles Investment Company, and on different occasions in 1913 had called upon some of the defendants, officials of the Investment Company, concerning the payment of the obligations of the company held by him. Defendant Derby, in support of his motion to quash, filed an affidavit wherein he said that on November 8, 1913, Col. Gear called upon him, and, after inquiring about getting the notes cashed, said that he was on the grand jury, and that if the matter came up before the grand jury he (Derby) might need a friend; that he did not pay the note, and that he told Mr. Gear that as a member of the grand jury he would get no special favors. On November 10, 1913, Col. Gear left with Deeble, the secretary of the company, a note setting forth grievances which his client had against the Investment Company, and stating that his

client wanted her money and damages in withholding the payment of the same. November 11th Col. Gear appeared before the grand jury, and read to his fellow grand jurors a statement to this effect; that he believed himself disqualified from acting as a member of the grand jury if they should undertake to investigate a matter which he desired to call to their attention; that the Los Angeles Investment Company had invited the public to invest in gold bonds of the company as being a first lien on all assets of the corporation, whereas in truth he found that they were not secured by assets, but were merely liabilities entitling the holders to participation in the assets of the company along with other creditors, and he desired the grand jury to take such action as might seem appropriate.

There is nothing to show that the grand jury had been considering any charge against the Los Angeles Investment Company before Mr. Gear read his statement to the body. The foreman of the grand jury and the secretary filed counter-affidavits saying that the grand juror Gear was not present at any time during the deliberations or the proceedings upon which the indictments against these defendants were based or returned; that he left the grand jury room before the matter was taken up or considered, and did not return, and never was present in the grand jury room when the matters were heard or considered or discussed by the members of the grand jury; and that the statement read by Mr. Gear on November 11th had been thereafter given by the foreman to the United States attorney, and was not thereafter read or considered in the proceedings or deliberations of the jury. The grand juror Gear himself, in an affidavit, denied that he had ever told Derby that, if the matter of the Los Angeles Investment Company should come before the grand jury, he might need a friend, and denied that the question of his being on the grand jury ever was mentioned; but said that when he called on Derby he sent in a card, upon which he wrote, "Will Mr. Derby see Col. Gear, 4306 E. First street, member of United States grand jury?" Mr. Gear further says in his affidavit that he did not attend the sessions of the grand jury while the investigation of the officers of the Los Angeles Investment Company was in progress, heard none of the evidence, and did not vote on the indictment, and never talked to any member of the grand jury in reference to the company, and never tried to influence or persuade any member of the grand jury to vote to indict the officers of the company; that he considered it his duty to present the matter to the grand jury as he did, because he had received through the United States mails literature in reference to the "Gold Notes" in which a client of his had invested a thousand dollars.

There is no doubt of the fact that, if a grand juror knows that a crime has been committed which is properly the subject of investigation by the grand jury of which he is a member, it is his duty to call the matter to the attention of his fellow grand jurors. Of course, if he is in any way personally or otherwise directly concerned, he should excuse himself from participation in the investigation and the deliberations of the grand jury with respect to the matter. Clearly, in the present case, the grand juror did nothing illegal, and we affirm the ruling that there was no sufficient ground for quashing the indictment.

[3] It is said that the verdict should be set aside because of the misconduct of a trial juror. The point comes in this way: The court made an order that the jury should not be allowed to separate after it was impaneled and sworn, but on the morning of July 21, 1915, while the trial was in progress, one of the jurors told the bailiff in charge he must go down to his office. The bailiff told him that there was not time for him to do this, meaning that there was not time before the opening of court to assign the proper court officer to accompany the juror to his office. The juror said that he would go and take the consequences. The juror was gone about 20 minutes, and then returned. Except for the fact of this brief separation of the jurors, no circumstance is shown to justify an inference of possible injury to the rights of the defendant. The Supreme Court in Holt v. United States, 218 U. S. 245, 31 Sup. Ct. 2, 54 L. Ed. 1021, 20 Ann. Cas. 1138, in discussing the action of the District Court in overruling a motion for a new trial based upon the ground that some of the jurors had read articles on the case in the daily papers while the trial was going on, said:

"We are dealing with a motion for a new trial, the denial of which cannot be treated as more than matter of discretion or as ground for reversal, except in very plain circumstances indeed. Mattox v. United States, 146 U. S. 140 [13 Sup. Ct. 50, 36 L. Ed. 917]. See Holmgren v. United States, 217 U. S. 509, [30 Sup. Ct. 588, 54 L. Ed. 861, 19 Ann. Cas. 778]. It would be hard to say that this case presented a sufficient exception to the general rule The judge did not reject the affidavit, but decided against the motion on the assumption that more than it ventured to allege was true. As to his exercise of discretion, it is to be remembered that the statutes or decisions of many states expressly allow the separation of the jury even in capital cases. Other states have provided the contrary. The practice has varied, with perhaps a slight present tendency in the more conservative direction. If the mere opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain jury trials under the conditions of the present day."

A number of exceptions are based upon the action of the court in admitting and excluding certain testimony. We have examined them, and find no substantial error in the rulings of the court. Nor do we find error in the instructions which stated the law carefully and with sufficient fullness to enable the jury to understand the principles which should control in their consideration of the evidence.

Believing that no substantial reason is advanced for holding that the defendants did not have a fair and legal trial, the judgment is affirmed.